IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIAM EMERSON TOWNSEND,

    Petitioner,               No. CIV S-03-0520 GEB PAN P

    vs.

MICHAEL KNOWLES, Warden,

    Respondent.            FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent has answered.  Petitioner has replied.

        Petitioner challenges his 1998 conviction of second degree murder and sentence of fifteen years to life plus an additional consecutive year for personal use of a knife.  See Cal. Pen. Code § 187, 12022(b).

        Petitioner claims his constitutional rights were violated by the trial court's instructing the jury that it could base a finding of malice on the felony murder rule with assault with a deadly weapon as the underlying felony in violation of state law; the trial court's instructing the jury that it must acquit on greater charges before reaching lesser included offenses; trial counsel's ineffectiveness in failing to challenge the jury instructions mentioning

/////

felony murder, defining implied malice and voluntary manslaughter and directing the jury that is must acquit him of greater offenses before finding him guilty of lesser offenses.

FACTS[1]

For 11 years, Brenda Hall (Hall) had lived in the same house on Loma Verde Way.  Tunika Montgomery (Tunika) as well as Hall's other daughters, Daphne Smith (Daphne) and Jade Hall (Jade), had previously lived with Hall. Tunika and her husband Marc Montgomery (Marc) moved out in 1997, after having lived with Hall for two years. Defendant, who Hall had met in April 1997, moved in a few days after meeting, initially as a renter but almost immediately thereafter became romantically involved with Hall and they planned to wed.

Hall's daughters and their respective husbands/boyfriends did not approve of defendant and were causing tension between Hall and defendant.  Hall claimed Tunika and Daphne had taken money out of Hall's bank account without Hall's consent because of Hall's relationship with defendant. Defendant knew about the stolen money because Hall could not pay rent or the bills or buy groceries.  Tunika claimed she had taken the money to pay her mother's bills as she had always done.

Hall claimed that when Marc met defendant in April 1997, Marc threatened defendant and wanted "to kick his ass."  Carl Smith, Daphne's husband, said the same to defendant.

On June 2, 1997, Jade moved out of Hall's home.  Hall's other daughters and their husbands were present, including Marc. Carl said negative things to Hall about defendant. Carl called defendant a "little bitch." Carl said he was going to show defendant "who was the baddest." Marc was present when Carl made these statements.  Defendant was not present but Hall told defendant about the threatening statements.  Carl and defendant reconciled sometime between June 2 and June 6, 1997.

About 10:30 a.m. on June 6, 1997, defendant left the home he shared with Hall and walked to the store.  While he was gone, Tunika arrived with Marc.  In the garage, Tunika yelled at Hall to evict defendant because he was not a good person and needed to leave.

About 15 minutes later, defendant returned from the store with two white plastic bags of groceries. According to Hall, defendant asked Marc to move his car which had been parked in Hall's garage for some time.  Marc angrily asked defendant, "Hey man, what's this I hear about you want to kick my a-s-s." Defendant denied saying that. Marc pushed and choked defendant who did not fight back, just broke the choke-hold and stared at Marc in shock.

/////

---

[1] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Townsend, No. CO30565, a copy of which is attached as Exhibit A to Respondent's Answer, filed July 8, 2003 (hereafter "slip op.").

2

Defendant dropped the bags on the lawn adjacent to the driveway and went into the house.

Hall started to hand roll the metal garage door down and told Marc and Tunika "to go on, just leave us alone." Hall thought the scuffle was over. Marc and Tunika were headed toward their car parked on the street. Hall heard Marc snicker, "I knew [defendant] was nothing but a punk assed bitch." About 30 seconds later, when Hall had the garage door down part way, defendant came out of the house. Holding a serrated-type knife measuring over 13 inches long, defendant went past Hall ducking under the garage door. Hall said, "William, don't. William, no." Three or four seconds later, Hall saw Marc, next to the door of the car parked in the driveway, holding his stomach. Marc backed up and fell in the street. Defendant followed, holding the knife out in front of him.

A passerby, Diane Vela, described the altercation differently. As she was driving by, she stopped to watch two men fighting near the sidewalk, each swinging his fists. She only saw defendant land a blow. She never saw Marc choke defendant. The fight ended with defendant running into the garage. Vela then heard a woman yell at Marc to get in the car. Two minutes after running into the garage, defendant came out of the garage waving a knife. Marc jumped up onto the hood and then the roof of the car parked in the driveway. Marc jumped from the trunk to the driveway and started backing up with his hands up and palms forward. Defendant kept moving toward Marc with the knife. Marc made no aggressive moves toward defendant. They were yelling something but Vela could not hear the words. Marc continued to back up and then fell in the street. Vela did not see the stabbing but thought it occurred when Marc was on top of the car because defendant kept moving the knife back and forth.

Another passerby, Willie Scott, was walking by when he saw a car pull up and a man get out with grocery bags. The man with the bags walked into the garage and 30 to 45 seconds later, started arguing with another man. A scuffle ensued with each man pushing and shoving the other. The fight looked even. Three or four minutes later, one man went into the house and the other went toward a car. Scott claimed less than a minute after entering the house, defendant came out, said something to Marc who was near the street and hit him in the chest. Marc stumbled back and fell. When interviewed by the police, Scott never mentioned seeing any stabbing or punching motion.

According to Tunika, Marc asked defendant, "why is he threatening his family." Marc then pushed defendant and they got in a tussle. After defendant ran into the garage, Tunika wanted to go but Marc paced back and forth. When defendant came out of the garage, Marc walked around the car and toward defendant so that he was between defendant and Tunika. Defendant, holding a knife, chased Marc around the car. Marc ran backward and toward the car in the driveway. Defendant then "linked in to [Marc]" on the car. Tunika never saw defendant stab Marc. Tunika claimed Marc made no aggressive moves toward defendant.

Scott ran up to Marc and saw the knife near him in the street. Marc was bleeding from the chest. Scott heard defendant say, "I told you to leave me alone. You should have left me alone. Why you didn't leave me alone?" Another

3

neighbor saw defendant kneeling over Marc, rendering aid or consoling, and heard defendant say, "[Y]ou guys just kept pushing. You wouldn't let me alone. You kept pushing . . . . Hang on. Help is coming. Hang on. Don't go to sleep. Help is almost here." Hall heard defendant say that he had told them to leave him alone and to stop "messing" with him.

Marc was pronounced dead at the scene. An autopsy revealed Marc was 5 feet 9 inches tall and weighed 180 pounds. He died from a single stab wound to the chest. The wound measured about one and one-half inches long, one-eighth of an inch wide and over five inches deep. The stabbing was done with significant force, enough to fracture a rib in Marc's back. Marc had no defensive wounds.

Defendant who was 5 feet 9 inches tall and weighed 200 pounds had no injuries whatsoever.

Drops of blood started at the car parked in the driveway and led to Marc lying in the street.

Defendant did not testify at the trial but claimed self-defense based in part on antecedent threats. Hall testified that defendant told her this case is a case of self-defense, that he was being choked and attacked in his own home and that Marc ran right up on him.

## ANALYSIS

I. <u>Standards for a Writ of Habeas Corpus</u>

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different

4

1  result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406
2  (2000)).

3          Under the "unreasonable application" clause of section 2254(d)(1), a federal
4  habeas court may grant the writ if the state court identifies the correct governing legal principle
5  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the
6  prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ
7  simply because that court concludes in its independent judgment that the relevant state-court
8  decision applied clearly established federal law erroneously or incorrectly. Rather, that
9  application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63,
10 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent
11 review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

12         The court looks to the last reasoned state court decision as the basis for the state
13 court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court
14 reaches a decision on the merits but provides no reasoning to support its conclusion, a federal
15 habeas court independently reviews the record to determine whether habeas corpus relief is
16 available under section 2254(d). Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

17 II. Petitioner's Claims
18    A. Procedural Default
19         Respondent contends petitioner defaulted a state procedural rule with respect to
20 all his claims and so this court is barred from reaching the merits.

21         Petitioner did not raise on direct appeal any of the claims he now makes. He first
22 raised them in his petition for a writ of habeas corpus in the trial court, which found that the
23 petition was untimely and that petitioner failed adequately to explain the delay pursuant to In re
24 Clark, 5 Cal.4th 750 (1993).

25         Based on concerns of comity and federalism, federal courts will not review a
26 habeas petitioner's claims if the state court decision denying relief rests on a state law ground that

is independent of federal law and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722 (1991); Harris v. Reed, 489 U.S. 255, 260-62 (1989). Generally, the only state law grounds meeting these requirements are state procedural rules. If there is an independent and adequate state ground for the decision, the federal court may still consider the claim if the petitioner can demonstrate: (1) cause for the default and actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental miscarriage of justice. Harris, 489 U.S. at 262 (citing Murray v. Carrier, 477 U.S. 478, 485, 495 (1986)).

The Ninth Circuit has explained the independent and adequate state ground requirement:

> A procedural default is not "independent" if, for example, the state procedural bar depends upon an antecedent determination of federal law. Similarly, the procedural default is not "adequate" if the state courts themselves bypass the petitioner's default and consider his claims on the merits, if the procedural rule appears to be discretionary, or, ordinarily, if the state fails to assert an interest in compliance with its procedural rules in the petitioner's federal habeas proceedings.

Harmon v. Ryan, 959 F.2d 1457, 1461 (9th Cir. 1992) (citations omitted); see also Park v. California, 164 F.3d 1226 (9th Cir. 1999). California's untimeliness rule under Clark is an independent state procedural ground for denying habeas relief. Bennett v. Mueller, 322 F.3d 573, 581 (9th Cir. 2003).

Petitioner purportedly defaulted on November, 20, 2001, when he filed a habeas petition in the Sacramento County Superior Court. Since this was after the decision in Clark, as to petitioner the rule is independent.

But the question of adequacy remains open. A state rule is adequate if it is firmly established and regularly followed by state courts at the time of the purported default. Lee v. Kemma, 534 U.S. 362, 389 (2002); Hill v. Roe, 321 F.3d 787, 790 (9th Cir. 2003). The state has the burden of pleading and proving the adequacy of its rule. Bennett v. Mueller, 322 F.3d 573, 585-86 (9th Cir.), *cert. denied*, 540 U.S. 938 (2003).

6

1    Respondent has the burden of showing the rule regularly and consistently is
2 applied such that judicial exercise of discretion, "at least over time, can become known and
3 understood within reasonable operating limits. Bennett, 322 F.3d at 583. Rules that irregularly
4 and inconsistently are applied generally fall into the following categories: (1) those that
5 selectively are applied to certain litigants; and (2) those that are so unsettled because of
6 ambiguous or changing state authority that their application to bar a claim would be unfair. Id. at
7 583; Morales v. Calderon, 85 F.3d 1387, 1392 (9th Cir. 1996). Respondent must adduce
8 evidence in the form of state court decisions in non-capital cases. See Bennett, 322 F.3d at 584.
9    Respondent contends that the "components of California's untimeliness bar –
10 substantial delay, good cause, and the exceptions – were clear and well-established at the time
11 Petitioner defaulted his federal claims." He argues that petitioner should have known he had to
12 file a habeas petition when counsel filed an initial brief on appeal because appellate counsel had
13 an ethical obligation to advise petitioner to seek state post-conviction relief since the facts giving
14 rise to the claims were within the record and therefore were known to counsel. (Answer at 12).
15    But respondent offers no evidence upon which the court could base a finding that
16 the timeliness rule is not selectively applied to certain litigants or that state authority about this
17 aspect of the rule has not been subject to conflicting judicial interpretation that would confuse or
18 mislead a litigant, thereby making it unfair to bar review in federal court.
19    The court therefore finds respondent has not shown California's timeliness rule to
20 be adequate to bar federal review of the merits of petitioner's claims.
21   B. Merits
22      I. Jury Instruction Claims
23    In general, federal habeas corpus relief is not available for jury instruction error
24 unless the error so infects the entire trial that the resulting conviction violates due process,
25 rendering the trial fundamentally unfair. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991); Duckett
26 v. Godinez, 67 F.3d 734, 745-46 (9th Cir. 1995). A federal court must evaluate jury instructions

7

"'in the context of the overall charge to the jury as a component of the entire trial process.'" Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (per curiam) (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).

Jury instructions must give effect to the requirement that the prosecution prove each and every element of the crime charged beyond a reasonable doubt. Sandstrom v. Montana, 442 U.S. 510, 520-21 (1979); In re Winship, 397 U.S. 358, 364 (1970). A jury instruction violates due process when considering the overall jury charge, there is a reasonable probability the jury applied it in a way that violates the constitution, such as by failing to hold the prosecution to its burden of proof. Middleton v. McNeil, 124 S.Ct. 1830, 1832 (2004); Estelle v. McGuire, 502 U.S. 62, 72 (1991); Sandstrom 442 U.S. at 520-21; Cupp v. Naughten, 414 U.S. 141, 147 (1973). The law presumes the jury follows the instructions given. Richardson v. Marsh, 481 U.S. 200, 211 (1987).

Petitioner claims that instructing the jury on felony-murder for assault with a deadly weapon as the underlying felony removed the intent element from the jury's consideration, effectively directing the jury to find malice aforethought "contrary to clearly established state law." (Petition at 7, 8).

The trial court on habeas made the following determination:

> [P]etitioner is incorrect that the second degree felony-murder rule violates due process in taking away from the jury the question of malice aforethought. That argument has long been rejected by the California Supreme Court (see Hansen, supra; People v. Patterson 1989 49 Cal.3d 615; People v. Dillon (1983) 24 Cal.3d 441, 472-76).

(Respondent's Exhibit E, In re William Emerson Townsend, Case No. 01F09167).

In California, second degree murder consists of the unlawful killing of a human with malice aforethought. People v. Fuller, 150 Cal.Rptr. 515, 520 (Cal. App. 1978). The felony-murder rule "imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life." People v. Hansen, 36 Cal.Rptr.2d 609, 612 (Cal. 1994). Implied malice can be imputed for second-degree

8

1  murder based upon a finding that a defendant committed a felony that is "inherently dangerous to
2  human life," but not listed in section 189 of the California Penal Code. Hansen, 36 Cal.Rptr. 2d
3  at 613.  A general verdict finding a defendant guilty of first-degree murder based on either
4  premeditation or felony murder without unanimity as to which theory applies comports with
5  federal due process. See Schad v. Arizona, 501 U.S. 624 (1991); Sullivan v. Borg, 1 F.3d 926,
6  928-29 (9th Cir. 1993).

The state charged petitioner with first-degree murder and alleged with specificity that petitioner personally used a deadly and dangerous weapon, namely, a knife. CT. at 7. Petitioner's defense was that he acted at most in self-defense or at least in the heat of passion. RT. 315-328. The trial court instructed the jury that it must presume petitioner innocent until the prosecution proved petitioner's guilt beyond a reasonable doubt, defined homicide, set out the elements of first degree premeditated murder, second degree murder, voluntary manslaughter and involuntary manslaughter. RT. 255-270. The court also instructed the jury,

> If a person causes another's death, while committing a felony which is dangerous to human life, the crime is murder.

RT. 271.  The jury returned a general verdict finding petitioner guilty of second-degree murder. CT. 138.

The state did not charge petitioner with assault with a deadly weapon, the court did not instruct the jury on the elements of assault with a deadly weapon or on the specifics of second degree felony-murder, see CALJIC 8.32, and the prosecutor did not argue that assault with a deadly weapon was an inherently dangerous felony that would substitute for malice. The jury therefore had no basis for imputing malice to petitioner based upon his commission of assault with a deadly weapon.

Petitioner has not shown that the state court's determination was contrary to or an unreasonable application of federal law.

/////

1    Petitioner claims he was denied due process by the trial court's improperly
2 instructing the jury on implied malice.  He asserts that as instructed, the jury was relieved of its
3 obligation to find each element of the offense beyond a reasonable doubt.
4    The trial court on habeas determined:

> Petitioner ignores that California Supreme Curt case law has long held that implied malice for second degree murder exists when the killing results from an intentional act, the natural consequences of the act ore dangerous to human life, and the act is deliberately performed with knowledge of the danger to and with conscious disregard for human life.  (see People v. Nieto-Benitez (1992) 4 Cal.4th 91, 110-112 [1998 version of CALJIC No. 8.31 correctly states definition of implied malice]).

States have broad authority to interpret their criminal statutes. See Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir. 1993) (federal courts are "bound by a state court's construction of its own penal statutes"); Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989) (federal habeas courts must defer to a state court's construction of its own penal code unless the construction is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation.")

California defines second degree murder as the killing of another human being with malice aforethought. People v. Fuller, 150 Cal.Rptr. 515, 520 (Cal. App. 1978).  Malice is defined by statute:

> Such malice may be express or implied.  It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.  It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.
>
> When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought.  Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice.

Cal. Pen. Code § 188.

The trial court gave the following instruction for second-degree murder:

> Murder in the second degree is the unlawful killing of a human being with malice aforethought, when the perpetrator intended unlawfully to kill a human being, but the evidence is insufficient to prove deliberation and premeditation.

   Murder of the second degree is also unlawful killing of a human being, when,

   One, The killing resulted from an intentional act;

   Two, The natural consequences of the act are dangerous to human life;

   And three, The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life;

   When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.

RT. 263.  The court explained malice as follows:

   "Malice" may be either express or implied.

   Malice is express when there is manifested an intention unlawfully to kill a human being.

   Malice is implied when,

   One, the killing resulted from an intentional act;

   Two, the natural consequences of the act are dangerous to human life;

   and Three, the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

RT. 261.   The language on implied malice came directly from CALJIC 8.31.

   Pursuant to California precedent, the prosecution proves implied malice by evidence the defendant performed "an act, the natural consequences of which are dangerous to life," which are "deliberately performed by a person who knows that his conduct endgangers the life of another and who acts with conscious disregard for life . . . ."  People v. Nieto Benitez, 4 Cal.4th (Cal. 1992).   Accordingly, an "abandoned and malignant heart" may consist of implied malice as defined by the California Supreme Court in People v. Nieto Benitez.

   Petitioner has not cited, and the court has not discovered, any precedent from the United States Supreme Court that would allow the court to find that the state court's construction of malice is contrary to or an unreasonable application of clearly established federal law.

   Petitioner's claim therefore fails.

Petitioner claims that since the trial court's definition of malice broadens the definition of second degree murder beyond its statutory scope, the trial court violated the doctrine of the separation of powers.

Petitioner's claim fails because it fails to state a federal claim. See Murtishaw v. Woodford, 255 F.3d 926, 960 (9th Cir. 2001) (state's violation of its own separation of powers doctrine does not rise to level of federal due process violation).

Petitioner claims the trial court's definition of malice broadens the definition of second degree murder so as to create a new crime and since he learned of it at trial it constitutes an ex post facto law.

The trial court on habeas did not reach this contention but the court nevertheless may deny relief. See 28 U.S.C. § 2254(b)(2).

The ex post facto clause forbids passage and application of laws that retroactively alter the definition of crimes or increase the punishment for criminal acts. Calif. Dept. of Corr. v. Morales, 514 U.S. 499, 504 (1995). Judicial construction of a statute does not create a new law for purposes of the ex post facto clause. Marks v. United States, 430 U.S. 188, 191 (1977); United States v. Ruiz, 935 F.2d 1033, 1035 (9th Cir. 1991).

The jury instruction on malice is based on a judicial construction of the second degree murder statute and so petitioner is not entitled to relief.

Petitioner claims the trial court's instruction on the definition of voluntary manslaughter "so infected the entire trial that the resulting conviction violates due process" because the instruction was inconsistent with the statutory definition of the crime. (Petition at 16-17).

The trial court on habeas determined:

> As petitioner was acquitted of first degree murder and convicted of second degree murder, it is possible that the jury rejected express malice but found implied malice (although it is also possible that the jury did find express malice, but rejected premeditation or deliberation; and, as further discussed below, it does not appear that the jury found second degree murder based on a felony-murder

1
2
3

theory).  If the jury found implied malice only, it necessarily rejected imperfect self-defense, as it would have found petitioner guilty only of involuntary manslaughter had it found imperfect self-defense to exist.  However, the jury did not have the chance to return a guilty of voluntary manslaughter based on heat of passion negating implied malice.   This appears to be the gist of petitioner's claim.

4
5
6
7
8

Insofar as petitioner claims that the jury should not have been instructed on voluntary manslaughter with either express or implied malice, the claim fails at the outset because there is no prejudice, as the jury necessarily found that either express or implied malice existed, in returning a verdict of guilt of second degree murder.  Thus, this court need not decide the more difficult issue that the trilogy of the (state-law cases) present, of whether express or implied malice is an element of voluntary manslaughter that must be proven to the jury, or whether the jury is to decide whether such malice, if present, is negated by heat of passion or imperfect self-defense.

9 (Answer, Exhibit E).

10 The trial court instructed the jury as follows:

11
12
The crime of manslaughter is the unlawful killing of a human being without malice aforethought.

13
It is not divided into degrees, but is of two kinds, namely, voluntary manslaughter and involuntary manslaughter.

14
15
Voluntary manslaughter is a lesser crime to that charged in the information.

16
17
Every person who unlawfully kills another human being with out [sic] malice aforethought, but with an intent to kill, is guilty of voluntary manslaughter in violation of Penal Code Section 192(a).

18
19
There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion, or in the actual but unreasonable belief in the necessity to defend one's self against imminent peril to life or great bodily injury.

20
In order to prove this crime, each of the following elements must be proved;

21 One, A human being was killed.

22 Two, The killing was unlawful;

23 And three, The killing was done with the intent to kill.

24 A killing is unlawful if it was neither justifiable nor excusable.

25
* * *

26
To reduce an intentional felonious homicide from the offense of murder to manslaughter, upon the ground of sudden quarrel or heat of passion, the

13

> provocation must be of the character and degree as naturally would excite and arouse the passion, and the assailant must act under the influence of that sudden quarrel or heat of passion.

RT. 263-265. The court also explained what constitutes a sudden quarrel, heat of passion, adequate provocation and emphasized that fear, revenge and the emotional component of an intent to commit a felony do not suffice. RT. 265-266.

California defines voluntary manslaughter as "the unlawful killing of a human being without malice," either "upon a sudden quarrel or heat of passion." Cal. Pen. Code 192(a). The state supreme court has held that a trial court errs when it instructs a jury it must find intent to kill in order to convict of voluntary manslaughter. See People v. Lasko, 23 Cal.4th 101 (Cal. 2000).

As a whole, the voluntary manslaughter instruction emphasized the distinction between the level of intent to kill required for voluntary manslaughter as opposed to first and second degree murder. A rational understanding of the instructions is that to convict of second degree murder, the jury had to find defendant harbored a malicious intent to kill but to convict of voluntary manslaughter, the jury had to find defendant harbored an intent to kill aroused by extreme circumstances not justifying or excusing the killing.

Accordingly, there is no basis for finding the instruction is grounds for federal habeas corpus relief.

Petitioner claims that instructing the jury it must find petitioner not guilty of greater offenses before it could find him guilty of lesser offenses violated due process by shifting the burden to petitioner to prove his innocence of the greater offenses.

The trial court on habeas corpus determined petitioner failed to state a prima facie case for relief because:

> Petitioner ignores that California Supreme Court case law has long upheld this specific "acquittal-first" instruction (see Poeple v. Kurtzman (1988) 46 Cal.3d 322, 332; Stone v. Superior Court (1982) 31 Cal.3d 503, 519).

(Answer, Exhibit E).

States enact criminal law and have a corresponding interest in enforcing it. <u>Sparf v. United States</u>, 156 U.S. 51 (1895). Once the state charges a crime and an accused exercises his right to a jury trial, federal due process requires the state to prove each fact constituting the offense charged beyond a reasonable doubt, <u>In re: Winship</u>, 397 U.S. 358 (1970), and under the Sixth Amendment, the jury determines the facts and the judge determines and instructs the jury to follow the applicable law. <u>Sparf</u>, 156 U.S. at 105-106. In this scheme, a jury cannot consider acquittal or lesser included offenses independently of the offense charged without disregarding the law. The judge's instruction violated none of petitioner's constitutional rights.

Petitioner is not entitled to relief on this claim.

   ii. <u>Ineffective Assistant of Counsel</u>

Petitioner argues that both his trial and appellate counsel rendered ineffective assistance. The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. <u>Strickland</u>, 466 U.S. at 688. To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. <u>Id.</u> at 690. The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. <u>Id.</u> "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." <u>Hughes v. Borg</u>, 898 F.2d 695, 702 (9th Cir. 1990) (citing <u>Strickland</u>, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice. <u>Strickland</u>, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. A

reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also Williams v. Taylor, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

The Strickland standards apply to appellate counsel as well as trial counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000); Smith v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989). However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751 (1983). Counsel "must be allowed to decide what issues are to be pressed." Id. Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined." Id. See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th Cir.), cert. denied, 525 U.S. 929 (1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy.") Further, there is, of course, no obligation to raise meritless arguments on a client's behalf. See Strickland, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice). Thus, counsel is not deficient for failing to raise a weak issue. See Miller, 882 F.2d at 1434. In order to demonstrate prejudice in this context, petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal. Miller, 882 F.2d at 1434 n.9.

The trial court on habeas determined plaintiff could not demonstrate prejudice for the same reasons he could not show error in his direct challenges to the jury instructions. (Answer, Exhibit E).

A. <u>Trial Counsel</u>

The court has examined the challenged jury instructions in the context of all the other instructions, California law, federal law, the crime charged and the evidence at trial. The jury was not presented with an easy set of facts or with obviously credible witnesses and so it was faced with the arduous task of separating veins of fiction from nuggets of truth in order to discern petitioner's level of intent. The jury deliberated for about four to four and one-half hours and requested the testimony of two witnesses. It did not request any clarification of the law.

Under these circumstances, the court cannot say that if counsel successfully had objected to any single instruction, any combination thereof or all the instructions, there is a reasonable probability of a different outcome.

The state court's decision is not contrary to or an unreasonable application of clearly established federal law.

B. <u>Appellate Counsel</u>

The trial court on habeas explained in detail how petitioner's claims would have failed in state court.

Again, the court cannot say that if counsel successfully had objected to any single instruction, any combination thereof or all the instructions, there is a reasonable probability of a different outcome. The state court's decision is not contrary to or an unreasonable application of clearly established federal law.

For all the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 20 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file

17

1 objections within the specified time may waive the right to appeal the District Court's order.
2 Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
3 DATED: April 20, 2006.

_____
UNITED STATES MAGISTRATE JUDGE

\004
\ town0520.157